UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff*

v.

ALFREDO MARTIN UNZUETA,

    *Defendant.*

_____/

CRIM. CASE NO: 1:20-cr-20121

DISTRICT JUDGE THOMAS L. LUDINGTON
MAGISTRATE JUDGE PATRICIA T. MORRIS

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
FOR AN EVIDENTIARY HEARING TO BE HELD TO DETERMINE IF THIS
COURT HAS SUBJECT MATTER JURISDICTION**

**I.    RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that the court hold an evidentiary hearing to determine whether this Court has or lacks jurisdiction over the above-entitled case.

**II.    REPORT**

    **A.    Introduction**

On February 14, 2020, Defendant was charged in a criminal complaint with Domestic Assault by a Habitual Offender under 18 U.S.C. §§ 117(a) and 1151 (defining Indian country). (ECF No. 1.) The affidavit in support of the criminal complaint stated that the victim "L.W. told police that she is Indian. The police verified that she has been previously charged criminally in the Saginaw Chippewa Tribal Court and are aware that Tribal Court cannot charge someone with a crime there unless that person is Indian. Unzueta is non-Indian." (ECF No. 1, PageID.3, ¶ 10.) At a detention hearing held on February 20, 2020, Defendant was placed on bond. (ECF No. 7, 8.) On February 26, 2020, a grand jury returned an indictment for the same charge. (ECF No.

10.) Prior to the arraignment held on March 6, 2020, the Court received a hand-delivered letter from the victim, which the Court provided to both counsel and then docketed. (ECF No. 11.) Included with the letter was a document received by the victim from the enrollment officer of the Saginaw Chippewa Indian Tribe stating that the victim did not meet the eligibility requirements to become a member of the Tribe, *i.e.*, she was not born to a member of the Tribe nor did she possess ¼ degree Indian blood from a Federally Recognized Tribe. (*Id*.)

> As the Supreme Court has explained regarding the history behind §117(a),
>
> At the time of § 117(a)'s enactment, felony assault subject to federal prosecution required "serious bodily injury," § 113(a)(6) (2006 ed.), meaning "a substantial risk of death," "extreme physical pain," "protracted and obvious disfigurement," or "protracted loss or permanent impairment of the function of a bodily member, organ, or mental faculty." § 1365(h)(3) (incorporated through § 113(b)(2)).

*United States v. Bryant*, 136 S. Ct. 1954, 1961 (2016) (holding that defendant's uncounseled tribal-court convictions could be used as a predicate offense in a § 117(a) prosecution without violating the U.S. Constitution). In order to "stem the tide of domestic violence experienced by Native American women[,]" Congress enacted § 117(a) which imposes felony-level punishment for serial domestic violence offenders, *i.e.*, up to five years imprisonment for a domestic assault perpetrated by a person who has at least two prior convictions for assault, sexual abuse, or a violent felony against a spouse or intimate partner. *Id.* at 1960-61; § 117(a).

**B.    Analysis**

This Court must always assess whether it has subject matter jurisdiction, *i.e.*, whether it has the "'statutory or constitutional power to adjudicate the case.'" *United States v. Shahulhameed*, 2017 WL 9325352, at *4 (E.D. Ky. Apr. 14, 2017) (quoting *United States v.

*Cotton*, 122 S. Ct. 1781, 1785 (2002)). Since subject matter jurisdiction "involves a court's ability to hear a case, challenges to subject-matter 'can never be forfeited or waived,' and defects 'require correction regardless of whether the error' was previously raised." *Id*. (quoting *Cotton*, 122 S. Ct. at 1785).

### 1. Whether the status of the victim matters

It is undisputed that Defendant is a non-Indian. It is anticipated that the government will contend that the status, Indian or non-Indian, of the victim in this case is irrelevant to the court's jurisdiction. Thus, the first question is whether the victim's status is relevant. For the reasons stated below, I suggest that it is under any of the potential bases for jurisdiction. The Court will consider the various potential bases for this Court's jurisdiction in turn.

### a. Major Crimes Act (MCA), 18 U.S.C. § 1153

"It is undisputed that Indian tribes have power to enforce their criminal laws against tribe members. . . . Their right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions." *United States v. Wheeler*, 435 U.S. 313, 322 (1978), superseded by statute on other grounds as stated by *United States v. Lara*, 541 U.S. 193, 207 (2004). That power was invaded when, in 1885, Congress passed the Major Crimes Act providing federal courts with jurisdiction over major crimes, such as murder, committed by an Indian occurring within Indian country. 18 U.S.C. § 1153 ("Any Indian who commits against the person or property of another Indian or other person any of the following offenses . . . ."). The Major Crimes Act was passed in response to the United States Supreme Court decision in *Ex Parte KANG-GI-SHUN-CA (otherwise known as Crow Dog)*, 109

3

U.S. 556 (1883). *Cohen's Handbook of Federal Indian Law* § 9.01, at 749 (Neil Jessup Newton ed., 2012); *see also Keeble v. United States*, 412 U.S. 205, 209 (1973) ("The Major Crimes Act was passed by Congress in direct response to the decision of this Court in *Ex Parte Crow Dog*. . . . The prompt congressional response—conferring jurisdiction on the federal courts to punish certain offenses—reflected a view that tribal remedies were either nonexistent or incompatible with principles that Congress thought should be controlling. . . ."). The enumerated offenses include "a felony assault under section 113" and although the charged crime in this case, assault by an habitual offender under § 117, is not expressly mentioned in § 1153, it could be argued that § 117 enhances the penalty for an ordinary assault under § 113 to the level of a felony; thus, making it actionable under § 1153, the Major Crimes Act. See, *United States v. Flett*, 2013 WL 1742269, at *1 (E.D. Wash. Apr. 23, 2013) ("Counts one, two, and three allege Mr. Flett committed the crime of assault in Indian Country. 18 U.S.C. §§ 1153(a) and 113(a). Count four alleges he is subject to enhanced punishment based upon prior domestic violence convictions. 18 U.S.C. § 117(a)."). The notion that § 117(a) was intended to be treated as a major crime under § 1153 is buttressed by case law assuming, without discussing, federal court jurisdiction over cases alleging a domestic assault by an Indian who is a habitual offender upon a victim who is also an Indian. *See, e.g.*, *United States v. Harlan*, 815 F.3d 1100, 1102 (8th Cir. 2016). However, resolution of that interesting question need not occur today since this case cannot proceed under § 1153 for another, more fundamental, reason.

It is undisputed that Defendant is not an Indian. By its express language, § 1153 applies only to "[a]ny Indian who commits against the person or property of another Indian or other

4

person" any of the enumerated crimes. Therefore, this court does not have jurisdiction over this case based on the Major Crimes Act, § 1153.

It should also be noted that even if the Major Crimes Act applied to crimes committed by non-Indians, which it does not, it certainly does not apply to cases involving only non-Indians. When addressing a case where a non-Indian murdered a non-Indian, the Court in *Draper v. United States*, 164 U.S. 240, 241-242 (1896), stated the following:

> It is clear that if the accused was an Indian, the court below had jurisdiction under the act of March 3, 1885 [Major Crimes Act], which, among other things, authorizes the punishment of any Indian committing the offense of murder within the boundaries of any state of the United States, and within the limits of an Indian reservation, according to the laws of and before the tribunals of the United States. *U.S. v. Kagama*, 118 U.S. 375, 6 Sup. Ct. 1109. The assertion of jurisdiction in the court of the United States over the crime of murder perpetrated by one not an Indian against one not an Indian is based on the fact that the offense was committed on an Indian reservation. The contention as to want of jurisdiction rests upon the proposition that, the Indian reservation being within the state, the courts of the state had alone cognizance of crimes therein done by other than Indians.

The Court cited *United States v. McBratney*, 104 U.S. 621 (1881), and stated that where a State "was admitted into the Union, and the enabling act contained no exclusion of jurisdiction as to crimes committed on an Indian reservation by others than Indians, or against Indians, the states were vested with jurisdiction to punish such crimes." *Draper*, 164 U.S. at 242-243. The Court held that a provision in Montana's enabling act—which stated that "'said Indian lands shall remain under the absolute jurisdiction and control of the United States'"—"was not intended to deprive the state of power to punish for crimes committed on a reservation or Indian lands by other than Indians[.]" *Id.* at 244, 247.

5

Similarly, when considering a portion of a treaty providing that "injuries done by individuals on either side . . . were to be reported by each nation to the other with a view of having the nation to which the individual offender belonged take 'such prudent measures . . . as shall be necessary to preserve . . . peace and friendship unbroken,'" the United States Supreme Court held that "[t]his latter language, upon which the petitioner most strongly relies as imposing a duty upon the United States to exercise jurisdiction over the whole Reservation as to the exclusion of the State, even as to offenses committed by whites against whites, cannot properly be interpreted as the petitioner asks." *New York ex rel. Ray v. Martin*, 326 U.S. 496, 500-501 (1946) (citation omitted). The Court explained,

> The entire emphasis in treaties and Congressional enactments dealing with Indian affairs has always been focused upon the treatment of the Indians themselves and their property. Generally no emphasis has been placed on whether state or United States Courts should try white offenders for conduct which happened to take place upon an Indian reservation, but which do not directly affect the Indians.

*Id*. at 501.

Accordingly, this Court would not have jurisdiction over a case, such as the instant case, involving even a major crime committed by a non-Indian against any other person under the Major Crimes Act. The Court's lack of jurisdiction would be further manifest if the victim is also a non-Indian. Thus, this Court lacks jurisdiction in the instant case under the Major Crimes Act even before resolution of the status of the victim in an evidentiary hearing. However, as stated above, if the victim is a non-Indian, the want of jurisdiction would be more patent.

### b. Indian Country Crimes Act (ICCA), 18 U.S.C. § 1152

The Indian Country Crimes Act was enacted to resolve at least some of the jurisdictional interplay between the sovereigns. 18 U.S.C. § 1152[1] states:

> Except as otherwise provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to Indian country.
>
> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

This section's predecessor and its current version are both interpreted as vesting jurisdiction with federal courts only to "offenses committed by Indians against white persons, and by white persons against Indians," while "those by Indians against each other were left to be dealt with by each tribe itself, according to its local customs." *Ex Parte KANG-GI-SHUN-CA*, 109 U.S. at 571-572. This federal court jurisdiction is sometimes referred to as "diversity" criminal jurisdiction or federal jurisdiction over "interracial" crimes. *See* Peter Nicolas, *American-Style Justice in No Man's Land*, 36 Ga. L. Rev. 895, 968 (2002) ("[T]he Indian Country Crimes Act provides a form of federal court criminal 'diversity' jurisdiction over criminal offenses committed in Indian Country by an Indian against a non-Indian, or by a non-Indian against an

---

[1] It should be noted that Michigan is not one of the six states (Alaska, California, Minnesota, Nebraska, Oregon, or Wisconsin) that Congress has recognized as having state jurisdiction over crimes committed in Indian country by or against Indians such that §§ 1152 and 1153 are inapplicable. 18 U.S.C. §§ 1162(a), (c). *United States v. Dakota*, 666 F. Supp. 989, 996 (W.D. Mich. 1985) (Out of a "primary concern of Congress" for the perceived "lawlessness on certain Indian reservations and the absence of adequate tribal institutions for law enforcement," "Public Act 280 [was enacted and] provided that certain states would have general criminal and limited civil jurisdiction over causes of action arising in Indian country.").

Indian."); Vanessa J. Jiménez & Soo C. Song, *Concurrent Tribal and State Jurisdiction Under Public Law 280*, 47 Am. U. L. Rev. 1627, 1650 (1998) ("The Act generally permits federal jurisdiction over 'interracial crimes' occurring in Indian country, where either (1) the victim is an Indian and the offender is not; or (2) the offender is an Indian and the victim is not and the crime is not an enumerated major crime.").

Despite the seemingly broad grant of power to the federal courts, the Supreme Court has long held that federal courts do not have jurisdiction over crimes committed by a non-Indian upon a non-Indian, *e.g.*, federal courts lack jurisdiction over "the crime of murder committed by a white man upon a white man within the Ute Reservation[.]"*McBratney*, 104 U.S. at 624.[2] Instead, when a crime is committed by a non-Indian upon a non-Indian victim in Indian country, the case is subject to the criminal jurisdiction of the State in which the reservation is located. *United States v. Antelope*, 430 U.S. 641, 643, n. 2 (1977) ("Under [*McBratney*], a non-Indian charged with committing crimes against other non-Indians in Indian country is subject to prosecution under state law.").

This principle was affirmed in *United States v. Prentiss*, 206 F.3d 960 (10th Cir. 2000). In *Prentiss*, the defendant was charged with arson under 18 U.S.C. § 81, and the court was presented with the issue of whether the indictment was legally sufficient where it failed to allege the status (Indian or non-Indian) of the defendant and the victim. The court concluded that the indictment was insufficient because "unless the arson occurred both (1) within Indian country,

---

[2] At the time *McBratney* was decided, § 25 of the Indian Intercourse Act of June 30, 1834, 4 Stat. 729, 733, was in place and this provision was later codified as § 2145 and ultimately § 1152. *Donnelly v. United States*, 228 U.S. 243, 270 (1913) (noting that the Court in *McBratney* did not mention the statute even though it was in effect at the time of the decision).

and (2) between an Indian and a non-Indian, it is not a crime under federal law and the federal courts have no jurisdiction to hear the case." *Id.* at 969.

Accordingly, if the victim is also a non-Indian, this Court would lack jurisdiction over the instant crime under § 1152 since the crime was committed by a non-Indian. Therefore, an evidentiary hearing is needed to determine the status of the victim and concomitant jurisdiction of this court.

### c. Federal enclave jurisdiction

Special maritime and territorial, *i.e.*, enclave, jurisdiction of the United States is defined in 18 U.S.C. § 7 and it includes "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof." 18 U.S.C. § 7(3). The Court in *Prentiss* noted that "Indian country is not simply a 'place within the sole and exclusive jurisdiction of the United States,' and concluded that § 7 does not extend federal jurisdiction to crimes committed in Indian country." *Prentiss*, 206 F.3d at 967. "Congress, had it wanted to extend federal criminal jurisdiction to Indian country, could simply have amended 18 U.S.C. § 7 to include Indian country. Instead, Congress exercised 'broad respect for tribal sovereignty, particularly in matters affecting only Indians' and limited federal jurisdiction over Indian country to interracial crimes." *Id.* at 967-968 (quoting *Felix S. Cohen's Handbook of Federal Indian Law* at 290 (Rennard Strickland, et al. eds. 1982)). Therefore, federal enclave jurisdiction would not

9

support jurisdiction in the instant case where the perpetrator is a non-Indian if the victim is also a non-Indian.[3]

### d. Assimilative Crimes Act (ACA)

Under 18 U.S.C. § 13(a),

> [w]hoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, or on, above or below any portion of the territorial; sea of the United States not within the jurisdiction of any State, Commonwealth, territory, possession, or district is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to like punishment.

The Third Circuit has explained that

> [u]nder the ACA, if conduct prohibited by state law occurs on federal land, the state criminal law is assimilated into federal law so long as that conduct is not already made punishable by any 'enactment of Congress.' . . . In other words, the ACA fills gaps in the law applicable to federal enclaves, ensures uniformity between criminal prohibitions applicable within the federal enclave and within the surrounding state, and provides residents of federal enclaves with the same protection as those outside its boundaries.

*United States v. Hall*, 979 F.2d 320, 322 (3d Cir. 1992) (citation omitted).

Since the charged conduct is expressly "made punishable by an[] enactment of Congress[,]" 18 U.S.C. § 13, the ACA does not apply to the instant charge.

---

[3]This result is buttressed by the fact that ownership of land in Indian Country, including the instant Isabella reservation, is a checkerboard of ownership, with some land owned by the United States and reserved for the benefit of the tribe and its members, some land owned unrestricted by the tribe or by individual Indians, and some land owned by non-Indians. *Saginaw Chippewa Indian Tribe v. Granholm*, 690 F. Supp. 2d 622, 632 (E.D. Mich. 2010) ("Although the Indian Reorganization Act [25 U.S.C. § 461 et seq.] allowed the Saginaw Chippewa to reacquire some of the land they lost in the aftermath of the 1855 and 1864 Treaties, they only regained control of one or two thousand acres of land in the six townships.").

Even if the ACA applied, as delineated in *Williams v. United States*, 327 U.S. 711, 714 (1946), crimes between non-Indians are not punishable under the ACA. In *Williams*, the Court "granted certiorari . . . because of the importance of the case in interpreting the Assimilative Crimes Act." *Id*. at 713. The crime charged was rape and it was alleged to have been committed by a non-Indian upon an Indian. The Court ultimately held that because the crime was defined by then existing federal law, the ACA did not make the State's definition of the crime applicable. The Court began by noting there was no dispute that the reservation upon which the crime occurred was "under the exclusive or concurrent jurisdiction" of the federal government under § 7 and that it was also "Indian country" under then § 2145 (later codified as § 1152). *Id*. at 713. The Court concluded that "[w]hile the laws and courts of the State . . . may have jurisdiction over offenses committed on this reservation between persons who are not Indians, the laws and courts of the United States, rather than those of [the State], have jurisdiction over offenses committed there, as in this case, by one who is not an Indian against one who is an Indian." *Id*. at 714. (footnote omitted).

This conclusion is supported by case law concluding that the ACA § 13 is, "'through § 1152, . . . applicable to Indian country.'" *United States v. Smith*, 925 F.3d 410, 414 (9th Cir. 2019) (quoting *United States v Marcyes*, 557 F.2d 1361, 1365 n.1 (9th Cir. 1977)); *accord United States v. Thunder Hawk*, 127 F.3d 705, 707 (8th Cir. 1997) ("The Assimilative Crimes Act, 18 U.S.C. § 13, is one of the federal enclave laws made applicable to Indian country by the ICCA [§ 1152]"). Since § 1152 (ICCA) requires diversity between the perpetrator and the victim, the ACA would not be applicable in Indian country absent satisfaction of the diversity requirement

11

in § 1152. *Smith*, 925 F.3d at 420 ("[W]e find that Congress intended to impose its express limitations on all federal enclave laws in Indian country, including the ACA . . . .Thus, the federal government may not invoke the ACA to prosecute cases in Indian country that the ICCA specifically excepts . . . .").[4]

Therefore, even if the ACA applied, which it does not, this court would not have jurisdiction under the ACA in this case where the perpetrator is a non-Indian, unless the victim is an Indian. Thus, the status of the victim would remain an important jurisdictional question if the ACA applied.

### e. Conclusion regarding status of the victim

For all the reasons stated above, I conclude that the status of the victim matters and that this Court's jurisdiction depends on it. Since the crime is alleged to have been perpetrated by a non-Indian, if the victim is also a non-Indian, I conclude that this Court lack jurisdiction to hear the case.[5,6]

---

[4] The Court also held that "the ICCA does not preclude application of the ACA to all 'victimless' crimes" including the alleged crime of fleeing and eluding the police because it is "a public safety offense, rather than a true 'victimless' crime, and falls well outside the area of domestic relations 'traditionally left to tribal self-government.'" *Id.* at 421.

[5] I also note that this case does not involve a statute of general applicability, such as conspiracy to deliver controlled substances, 21 U.S.C. § 846, or being a felon in possession of a firearm, 18 U.S.C. § 922(g), which could subject a non-Indian or an Indian to prosecution in federal court even when the offense was committed in Indian country. *United States v. Peltier*, 344 F. Supp. 2d 639, 544 (E.D. Mich. 2004) ("§1153 confers to the United States exclusive jurisdiction over certain major crimes, it applies only to the thirteen crimes specifically enumerated in that section" but "it does not strip the federal courts of jurisdiction of those crimes not enumerated therein; in fact, federal courts retain jurisdiction over violation of federal laws of general, non-territorial applicability" such as being a felon in possession of a firearm under 18 U.S.C. § 922(g) (citing *United States v. Yannott*, 42 F.3d 999 (6th Cir. 1994)).

[6] This result is also supported by Michigan's interpretation of the roles of sovereigns. *People v. Collins*, 298 Mich. App. 166, 176 (Mich. Ct. App. 2012) ("[W]e hold that . . . in general, state courts in Michigan have jurisdiction over a criminal prosecution in which a defendant is a non-Indian, the offense is committed on Indian lands or in Indian country, and the offense is either victimless or the victim is not an Indian.")

### 2. Evidentiary hearing

Since I have suggested that the status of the victim, *i.e.* whether she is an Indian or not, is essential to determining this Court's jurisdiction, I further suggest that an evidentiary hearing should be held to allow the parties to present proofs and make arguments concerning her status.

The same test applies to determine whether a person is considered an Indian for federal criminal jurisdictional purposes under either §§ 1152 or 1153. *United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009). Since the test is based on factors enunciated in *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005), they are often referred to as the *Bruce* factors. The test "requires that the Government prove two things: that the defendant has a sufficient 'degree of Indian blood,' and has 'tribal or federal government recognition as an Indian.'" *Bruce*, 394 F.3d at 1223-1224. In order to determine whether the second prong is met, courts consider the *Bruce* factors, namely: "(1) tribal enrollment; (2) government recognition formally and informally through receipt of assistance reserved only to Indians; (3) enjoyment of the benefits of tribal affiliation; and (4) social recognition as an Indian through residence on a reservation and participation in Indian social life." *Id.* at 1224. Here, there is some evidence that the victim was prosecuted by the tribe and that she claimed to be an Indian, but there is also evidence that she would not qualify for tribal membership. Some of the other questions raised by the *Bruce* factors have not yet been addressed. Since these are factually driven questions, I suggest an evidentiary hearing is needed to resolve them. *United States v. Loera*, 697 F. App'x 572 (9th Cir. 2017) (affirming magistrate judge findings that were adopted by the district court regarding Indian status).

### C. Conclusion

For all the reasons stated above, I recommend that an evidentiary hearing be held to determine whether the victim in this case is an Indian under the applicable federal criminal law. Since the Defendant is not an Indian, if the victim is not an Indian, I further recommend that the case be dismissed for lack of subject matter jurisdiction.

## III. REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it

pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: March 16, 2020            S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: March 16, 2020            By s/Kristen Castaneda
Case Manager